## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

ALPHA ENERGY,

               Plaintiff,

        -v.-

GEC, LLC
CONTINENTAL CASUALTY COMPANY

               Defendants.

                                  1:18 Civ. 58 (CAK)

GEC, LLC

                                  1:17 Civ. 15 (CAK)

               Plaintiff,              **OPINION AND ORDER**

        -v.-

ARGONAUT INSURANCE COMPANY

               Defendant.

## MEMORANDUM OPINION AND ORDER

CHERYL ANN KRAUSE, Circuit Judge, sitting by designation.

      THESE MATTERS come before this Court on three motions for summary judgment in related contract disputes regarding the construction of a housing development on St. Croix.  In the first, where Alpha Energy ("Alpha") has sued GEC, LLC ("GEC") for breach of contract and unjust enrichment, and Continental Casualty Company for failure to pay its performance bond, Alpha has moved for partial summary judgment, requesting that this Court (1) dismiss GEC's counterclaims, and (2) order GEC to pay most of the outstanding balance on the construction of a solar-powered microgrid (the "Microgrid") as part of the

development.  Alpha Mot. for Summary Judgment (Alpha MSJ) 1, *Alpha Energy v. GEC, LLC*, No. 1:17-cv-00015 (D.V.I. Sept. 24, 2020), ECF No. 161.  In the second, GEC has moved for partial summary judgment against Alpha, asking this Court to conclude that, as a matter of law, the diesel generators that Alpha installed do not meet the definition of "emergency generators" under the Clean Air Act and its implementing regulations.  GEC Mot. and Br. in Supp. of Summary Judgment (GEC MSJ Br.) 1, *Alpha Energy* (D.V.I. Sept. 24, 2020), ECF No. 159.  Finally, in a related case, Argonaut Insurance Company ("Argonaut") moves for summary judgment, contending that, for various reasons, GEC's claim for breach of the implied covenant of good faith and fair dealing must be dismissed. Argonaut Mot. and Br. in Supp. of Summary Judgment (Argonaut MSJ Br.) 11, *GEC, LLC v. Argonaut Ins. Co.*, No. 1:18-cv-00058 (D.V.I. Sept. 24, 2020), ECF No. 101.

For the reasons stated below, and after consideration of the parties' briefs, arguments during the hearing before the Court on December 12, 2023, and post-hearing submissions, this Court DENIES IN PART and GRANTS IN PART Alpha's motion for partial summary judgment, GRANTS GEC's motion for summary judgment, and DENIES Argonaut Insurance Company's motion for summary judgment.  Additionally, GEC's counterclaim for negligent misrepresentation is DISMISSED.

## FACTUAL BACKGROUND

This case arises out of a contract dispute relating to the construction of an affordable housing development on St. Croix.  As part of its plans for that development, the owner, JDC – Anna's Hope Associates, LLP ("JDC"), intended to use the Microgrid to provide electricity to the complex.  GEC—the general contractor for the housing development—

hired Alpha to build and install the Microgrid.  Argonaut acted as a surety on that subcontract, issuing a performance bond in the event of Alpha's non-performance.

## A.    The Contract to Build the Microgrid

Two documents governed the construction of the Microgrid: the change order ("Change Order No. 1") to the contract between JDC and GEC (the "General Contract"), and the contract between GEC and Alpha (the "Subcontract").  I review the relevant terms of each below.

GEC and Alpha entered into the Subcontract on July 7, 2015.  Alpha Statement of Undisputed Material Facts in Supp. of Mot. for Summary Judgment (Alpha SUMF) ¶ 1, *Alpha Energy* (D.V.I. Sept. 24, 2020), ECF No. 163.  That document tasked Alpha with the responsibility, *inter alia*, to "design, engineer, procure, supply and install all of the work required" for the Microgrid.  *Id.* Ex. A 1.

The Subcontract included a payment schedule, summarized below:

- 10% of the value of the contract was due fifteen days after signing;
- 10% was due upon design signoff;
- 30% was due when "materials [were] on site and GEC ha[d] incorporated them as Stored Materials in GEC's pay estimate to" JDC;
- 40% was to be paid as "[p]rogress payments" based on how much of the Microgrid Alpha had installed and commissioned, "when paid by [JDC] to GEC"; and
- 10% was held as retainage, to be released upon the completion of the project.

Alpha SUMF Ex. A 2.  GEC has paid Alpha only the first two installments, Alpha SUMF ¶¶ 6–9, although JDC paid GEC in full for Alpha's performance, *id.* ¶ 10; GEC Counterstatement of Undisputed Material Facts in Opp. to Mot. for Summary Judgment (GEC CSUMF (*Alpha Energy*)) ¶ 10, *Alpha Energy* (D.V.I. Oct. 15, 2020), ECF No. 173.

The Subcontract also contained certain representations from Alpha to GEC.  Alpha represented "that it and its agents and sub-contractors have the necessary expertise and technical and legal expertise to perform the work under the contract plans and specifications and all applicable laws, rules and regulations of the United States and the United State[s] Virgin Islands concerning the work/materials furnished hereby."  Alpha SUMF Ex. A 2.  Alpha also "guarantee[d] the good quality of the workmanship and materials being supplied by it under [the Subcontract]."  *Id.* at 3 ¶ 7.

According to the General Contract, the development originally was supposed to be ready by July 13, 2016.  The Subcontract provided that "[i]f [Alpha] fails to . . . complete [its] work in accordance with the schedule established by [GEC] it hereby agrees to indemnify and hold harmless [GEC] for any loss or damage caused by such delay."  *Id.* at 3 ¶ 16.  It also stated that, in the event that GEC terminated the Subcontract, Alpha "shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly finished at which time, if the unpaid balance of the amount due [Alpha] shall exceed the cost and expense incurred by [GEC] in completing this Agreement, such excess shall be paid by [GEC] to [Alpha]," or vice versa.  *Id.* at 3 ¶ 23.

Per Change Order No. 1, Alpha's obligations were "limited to competently and timely managing the procurement, delivery and installation of the components of this grid system at the site of the Project."  *Id.* at 7 ¶ 2(a).  Thus, JDC was to "look solely to and hold Alpha exclusively responsible and liable for the suitability and efficacy of the design, mix, installation, and short and long term performance of the combination of work and components that comprise" the Microgrid, and "was to solely look to Alpha for all liability

of any kind for all documentation, engineering, engineering sign off, guarantee, and performance responsibility for this procurement and the work under [the Subcontract]." *Id.* ¶¶ 2(b), 3.

## B. The Performance Bond

Argonaut acted as a surety on the Subcontract, issuing a performance bond in which it agreed to either ensure completion of the Microgrid or pay GEC a penalty sum of $1,652,000 in the event of Alpha's non-performance. Argonaut MSJ Ex. I 2, ECF No. 101-10. Payment under the performance bond was subject to certain terms and conditions, the most important of which are detailed below.

First, Alpha had to fail to perform under the Subcontract. *Id.* at 3 ("If [Alpha] performs the [Subcontract], [Argonaut] and [Alpha] shall have no obligation under this Bond.").

Second, there could be no "Owner Default." *Id.* The performance bond defined an Owner Default as "[f]ailure of [GEC], which has not been remedied or waived, to pay [Alpha] as required under the [Subcontract] or to perform and complete or comply with other material terms of the [Subcontract]." *Id.* at 4.

Third, GEC had to provide notice to both Alpha and Argonaut that it was considering declaring a "Contractor Default." *Id.* at 3. The performance bond defined a Contractor Default as "[f]ailure of [Alpha], which has not been remedied or waived, to perform or otherwise comply with a material term of the [Subcontract]." *Id.* at 4.

Only with these conditions satisfied could GEC notify Argonaut and declare Alpha in default. *Id.* at 3–4. Argonaut could then force Alpha to perform, self-perform, or solicit

5

bids for another contractor to complete the Microgrid. *Id.* It could also waive its right to perform and pay GEC damages for Alpha's default. *Id.* If it decided not to pay GEC the balance of the performance bond, Argonaut had to notify GEC of its denial and give reasons for its decision. *Id.*

In addition, the performance bond stated that Argonaut "shall not be liable to [GEC] or others for obligations of [Alpha] that are unrelated to the [Subcontract], and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations." *Id.* at 4.

## C.    Alpha's Attempts to Construct the Microgrid

Without recounting all of the parties' recriminations, all agree that construction of the Microgrid did not go as planned. By September 30, 2016, the rest of Anna's Hope had been substantially completed. GEC CSUMF, *Alpha Energy* ¶ 20. But the Microgrid was not ready. Alpha does not meaningfully dispute that GEC had to "self-perform a number of items . . . within Alpha's [s]cope of [w]ork," including "wiring for the Microgrid," "[c]ompletion of roof raking to meet Virgin Islands Building Code requirements," and "[p]ermitting fees for [the] generator." *Id.* ¶ 25. Even though the Microgrid was late, "GEC continued to work with Alpha" to "complete and commission the Microgrid" throughout 2016 and 2017. *Id.* ¶¶ 26–36. But the Microgrid was plagued by technical difficulties, and it repeatedly failed to work when Alpha tried to turn it on, *id.* ¶¶ 36–37, 47–53. Again, Alpha does not meaningfully dispute the truth of these statements. Alpha Response to GEC CSUMF ¶¶ 37, 47–53, *Alpha Energy* (D.V.I. Nov. 9, 2020), ECF No. 180. In the meantime, GEC had to connect Anna's Hope to the Virgin Islands Water and

6

Power Authority (the "Power Authority") power grid so it could power the development. GEC CSUMF, *Alpha Energy* ¶ 23; Alpha Response to GEC CSUMF ¶ 23, *Alpha Energy* (Nov. 9, 2020), ECF No. 180; Argonaut Statement of Undisputed Material Facts in Supp. of Mot. for Summary Judgment (Argonaut SUMF) ¶¶ 40–42, *Argonaut* (D.V.I. Sept. 24, 2020), ECF No. 101 Ex. U.

As part of the Microgrid, Alpha installed two 2016 Mercedes-Benz diesel generators (the Generators).  GEC Statement of Undisputed Material Facts in Supp. of Mot. for Summary Judgment (GEC SUMF) ¶ 8, *Argonaut* (D.V.I. Sept. 24, 2020), ECF No. 100. GEC has produced a "Certificate of Conformity" from the EPA showing that the Generators are "EPA Tier 3," generating between 130 and 225 kilowatts of electricity.  *Id.* Ex. H 4.  And while it is not clear when exactly Alpha installed the Generators at Anna's Hope, the application to the Virgin Islands Department of Planning and Natural Resources (the "Planning Department"), dated July 11, 2016, sought permission to operate the Generators for "[s]tand [b]y [p]ower [o]nly" and noted that the Generators were purchased earlier that year, in February 2016, *id.* Ex. I 2–5.

In June 2018, the Planning Department granted that application and issued a permit. Alpha Counterstatement of Undisputed Material Facts in Opp. to Summary Judgment (Alpha CSUMF) Ex. A ¶ 9, *Alpha Energy* (D.V.I. Oct. 14, 2020), ECF No. 169.  The permit specified that the Generators were to be operated "for standby use only," GEC SUMF Ex. L 4, and were required to comply with the emissions standards for Tier 3 generators, *id.* at 5 (designating the Generators "for emergency use only.  The use of the generator for prime

power is prohibited").[1]  Crucially, the permit did not "relieve" the Generators of "the responsibility of compliance with the provisions of any federal or territorial laws, rules, or regulations."[2]  *Id.* at 6.

Per Alpha's proposal for the Microgrid, the Generators were supposed to provide "excess generation" outside of "sun hours."  *Id.* Ex. G 5.  They thus would provide "peak load supply" and "compensate for uncooperative weather."  *Id.* at 6.  As Alpha explained in its proposal, "[t]o provide enough solar and battery standby to meet every conceivable peak in consumption would get very expensive, and therefor[e] unfeasible.  At some point it becomes more feasible to fill that demand with the generator set."  *Id.*  Alpha thus expected the solar array would power the Microgrid "approximately 89% of the time, with the remaining energy run by" the Generators.[3]  *Id.* at 5.  In other words, Alpha anticipated the Generators would provide approximately 11% of the development's ongoing power needs.  *Id.*

---

[1] The Planning Department's permit directed JDC to comply with the emissions standards for Tier generators listed at a since-reserved portion of the Code of Federal Regulations.  *See* GEC SUMF Ex. L 5; 40 C.F.R. § 89.112 (2005), *reserved*, Improvements for Heavy-Duty Engine and Vehicle Test Procedures, and Other Technical Amendments, 86 Fed. Reg. 34,308, 34,372 (June 29, 2021).

[2] Neither Alpha nor Argonaut contests these facts for the truth of them, instead dismissing GEC's point because "Alpha obtained a Tier 3 generator . . . as permitted by the [Planning Department]."  Argonaut Counterstatement of Undisputed Material Facts in Opp. to Summary Judgment 5 (Argonaut CSUMF), *Alpha Energy* (D.V.I. Oct. 15, 2020) ECF No. 174-4; Alpha Energy Response to GEC SUMF ¶ 8, *Alpha Energy* (D.V.I. Oct. 14, 2020), ECF No. 170.

[3] Again, Alpha and Argonaut do not dispute the truth of these representations.  Argonaut CSUMF at 3.

It is undisputed that, at some point after problems with Alpha's performance arose, GEC "obtained and installed a permanent utility connection to [the Power Authority] and continued to pay for electrical service to the project after . . . September 30, 2016." GEC CSUMF (*Alpha Energy*) ¶ 23; Alpha Response to GEC CSUMF (*Alpha Energy*) ¶ 23; Argonaut SUMF ¶¶ 40–42.[4]  The parties also do not dispute that, after each of its failed attempts to power Anna's Hope with the Microgrid, GEC had to reconnect the development to the Power Authority's grid.  GEC CSUMF (*Alpha Energy*) ¶¶ 34–36, 46–51; Alpha Response to GEC CSUMF (*Alpha Energy*) ¶¶ 34–36, 46–51; Argonaut Response to GEC CSUMF (*Argonaut*) ¶¶ 43–51.

GEC closed out the General Contract on May 5, 2017.  GEC CSUMF (*Alpha Energy*) ¶ 35.  While the Microgrid appears to have been working on the closeout date, it experienced another of its multiple failures just six days later. *Id.*  Despite Alpha's attempts to repair it (and JDC's assistance in those attempts), *id.* ¶¶ 39–52, the Microgrid has not powered Anna's Hope since August 24, 2018, *id.* ¶ 53.  GEC formally terminated the Subcontract on July 23, 2018.  *Id.* ¶ 45.

## D.    GEC's Declaration of a Default Under the Performance Bond

In light of the problems with the construction of the Microgrid, GEC notified Alpha and Argonaut that it was considering declaring Alpha in default under the performance bond on January 27, 2017.  Argonaut SUMF ¶ 27.  Argonaut retained Lane Young of

---

[4] Argonaut does not dispute the fact of these payments and contests only their purposes and circumstances.  Its challenges, however, are conclusory. *See, e.g.*, Argonaut SUMF ¶ 43 ("Payment for WAPA electric bills . . . [is] not part of the bonded subcontract.").

Rochester Solar Technologies to conduct an inspection of the Microgrid as part of its investigation. *Id.* ¶¶ 28, 32–33. What exactly happened after Young arrived at Anna's Hope on October 28, 2018, is subject to dispute, *see* GEC Response to Argonaut SUMF 10-13, but his report says GEC's lawyer told him that he could not restart the Microgrid or connect Anna's Hope to it. Argonaut MSJ Ex. N 10. Young did note that error logs in the Generators showed "decreasing fuel levels at 50%, 25% and at 10%," indicating the Generators were being used in addition to the Microgrid, and that "[t]here were a few times where the generator d[id] run out of fuel." *Id.* Nevertheless, Young concluded that the Microgrid "ha[d] the capability to operate as designed where the solar and battery storage system supply all the needed energy to the facility" and "[a]ll the components appear to be installed correctly and per the design drawings." *Id.*

Based on Young's report, Argonaut denied GEC's claim under the performance bond on November 19, 2018. Argonaut MSJ Ex. P 2–3. The denial letter faulted GEC for failing to keep the Generators fueled and "refus[ing] to cooperate" with the investigation. *Id.* at 2. It also noted that GEC had failed to pay Alpha, which Argonaut viewed as a condition precedent to payment. *Id.* at 3.

## PROCEDURAL HISTORY

Because GEC refused to pay Alpha anything beyond the first two installments in the Subcontract, Alpha sued GEC and its insurer, Continental Casualty, alleging breach of contract, unjust enrichment, and failure to pay its performance bond. Alpha Compl. ¶¶ 33–44, *Alpha Energy* (D.V.I. Mar. 20, 2017), ECF No. 1. GEC counterclaimed for breach of contract, unjust enrichment, and "misrepresentation." GEC First Am. Answer &

Countercl. ¶¶ 32–37, *Alpha Energy* (D.V.I. Sept. 19, 2018), ECF No. 62.  In addition, because of Argonaut's refusal to pay GEC under the performance bond, GEC sued it for breach of the implied covenant of good faith and fair dealing.  GEC First Am. Compl. (FAC) ¶ 36, *Argonaut* (D.V.I. Feb. 8, 2019), ECF No. 18.

## LEGAL STANDARD

"Summary judgment is appropriate if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Watson v. Rozum*, 834 F.3d 417, 421 (3d Cir. 2016); *see also* Fed. R. Civ. P. 56(a).  "[S]ubstantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*  And a dispute over a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quotation marks omitted).

## DISCUSSION[5]

This Court addresses each motion for summary judgment separately but will reference evidence in support of other motions to resolve them all in a single opinion.  In addition, while these are not cross-motions for summary judgment in the traditional sense, how each motion is resolved affects the disposition of others, as explained below.

---

[5] This Court has diversity jurisdiction under 28 U.S.C. § 1332.  GEC is a limited liability company organized under the laws of the Virgin Islands, where it has its principal place of business and where all of its members reside.  GEC FAC ¶ 2.  Alpha is a corporation organized under Nevada law with its principal place of business in Washington.  *Id.* ¶ 3.  And Argonaut is a corporation organized under Illinois law with its principal place of business in Texas.  *Id.* at ¶ 4.

### A.    GEC's Motion for Summary Judgment

GEC seeks judgment as a matter of law that the Generators procured by Alpha and installed as part of the Microgrid "are not 'emergency generators,' do not meet the requirements of the Clean Air Act (42 U.S.C. § 4201 *et seq.*) and EPA regulations adopted thereunder, and cannot be lawfully operated as part of the Microgrid in their intended use." GEC MSJ Br. 1. I will address each of those three issues in order.

As a preliminary matter, however, this Court must confront Alpha's and Argonaut's jurisdictional challenge. The Administrative Procedure Act (APA) gives federal courts jurisdiction to review the actions of certain governmental entities, but not "the governments of the territories or possessions of the United States." 5 U.S.C. §§ 551(1)(C), 701(b)(1)(C). According to Alpha and Argonaut, resolving GEC's motion for summary judgment would necessitate review of the Planning Department's issuance of a permit for the operation of the Generators, and thus would exceed the scope of the Court's jurisdiction under the APA. Alpha Br. in Opp'n to GEC Mot. for Summary Judgment (Alpha MSJ Opp'n Br.) 2–3, *Alpha Energy* (D.V.I. Oct. 14, 2020), ECF No. 167; Argonaut Br. in Opp'n to GEC Mot. for Summary Judgment (Argonaut MSJ Opp'n Br.) 3–4, *Alpha Energy* (D.V.I. Oct. 15, 2020), ECF No. 174. Not so.

GEC does not allege that it has "suffer[ed] a legal wrong because of" the Planning Department's conduct in issuing a permit, 5 U.S.C. § 702, but rather because of Alpha's conduct in installing diesel generators that did not comply with the Clean Air Act. Moreover, the Planning Department's permit still required the Generators to comply with "the provisions of any federal or territorial laws, rules, or regulations." GEC SUMF Ex. L

9.  So if the Generators did not comply with relevant emissions guidelines, then they were also out of compliance with the permit.  This Court can therefore determine that the Generators did not comply with environmental regulations without suggesting that the *permit* did not conform with the Clean Air Act.  *See* GEC MSJ Reply Br. 7.  And whether the Generators complied with the Clean Air Act on the undisputed facts of this case is a question of statutory interpretation only.  *Nat'l Res. Def. Council, Inc. v. Texaco Refin. and Mktg., Inc.*, 20 F. Supp. 2d 700, 709 (D. Del. 1998) (citing *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993)).  This jurisdictional hurdle cleared, I turn now to the merits of GEC's motion for summary judgment.

### 1.    Requirements of the Clean Air Act

GEC urges, as a matter of law, that the Generators ran afoul of the Clean Air Act. That statute makes it "unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to" it, 42 U.S.C. § 7411(e), unless the operator receives a valid waiver, *id.* § 7411(j)(1)(A).  Pursuant to its regulatory authority, the EPA has promulgated a series of emissions standards for manufacturers and operators of non-road (stationary), compression ignition internal combustion engines, like the Generators.  That highly reticulated scheme determines whether the Generators, as procured for and used in the Microgrid, comply with the Act and can be operated lawfully.

The EPA declares engines in compliance with different emissions standards "tiers" depending on their size, power, model year, and testing data that the manufacturer submits to the agency.  The EPA instructs manufacturers seeking certification of non-road

13

compression-ignition engines like the Generators to "[p]resent emission data for hydrocarbons . . . , [nitrogen oxides ("NOx"), particulate matter ("PM"), and carbon monoxide ("CO")] on an emission-data engine to show [their] engines meet the applicable duty-cycle emissions standards . . . ."  40 C.F.R. § 1039.205; *see also id.* § 1065.501(a)(7) (instructing applicants testing engines to "measure emissions during in-use engine operation" by, *inter alia*, "[s]ampl[ing] emissions throughout the duty cycle"); *id* § 1065.501(c) ("An emission test generally consists of measuring emissions and other parameters while an engine follows one or more duty cycles that are specified in the standard-setting part."); *id.* § 1065.1(a)(3) (applying the previous regulations to engines like the Generators).  Thus, data from an engine's certification test reflects its "[r]aw [e]missions," which the EPA considers sufficient to establish what they actually emit when used.  GEC SUMF Ex. H 4.

The tier required depends on what the engine will be used for and its model year. Anyone operating an engine of the size and model-year included in the Generators for a non-emergency purpose must comply with the relevant emissions standards for manufacturers at 40 C.F.R. § 60.4201.  40 C.F.R. § 60.4204(b).  Specifically, non-emergency generators post-dating model-year 2014 must be rated Tier 4, *id.* § 1039.101, meaning that the engine's emissions must satisfy the following standards:

Table 1 of §1039.101—Tier 4 Exhaust Emission Standards After the 2014 Model Year, g/kW-hr[a]

| Maximum Engine Power | Application | PM | NOx | NMHC | NOx+NMHC | CO |
|---|---|---|---|---|---|---|
| kW < 19 | All | 0.40[b] | - | - | 7.5 | 6.6[c] |
| 19 ≤ kW < 56 | All | 0.03 | - | - | 4.7 | 5.0[d] |
| 56 ≤ kW < 130 | All | 0.02 | 0.40 | 0.19 | - | 5.0 |
| 130 ≤ kW ≤560 | All | 0.02 | 0.40 | 0.19 | - | 3.5 |
| kW > 560 | Generator sets | 0.03 | 0.67 | 0.19 | - | 3.5 |
| kW > 560 | All except generator sets | 0.04 | 3.5 | 0.19 | - | 3.5 |

[a]Note that some of these standards also apply for 2014 and earlier model years. This table presents the full set of emission standards that apply after all the transition and phase-in provisions of §1039.102 expire.
[b]See paragraph (c) of this section for provisions related to an optional PM standard for certain engines below 8 kW.
[c]The CO standard is 8.0 g/kW-hr for engines below 8 kW.
[d]The CO standard is 5.5 g/kW-hr for engines below 37 kW.

*See* 40 C.F.R. § 1039.101(b). Thus, if used for a non-emergency purpose, engines like those incorporated in the Generators (post-dating model year 2014 and generating between 130 and 560 kilowatts of electricity) fall within in the fourth row of the Tier 4 table, limiting their NOx emissions to 0.4 grams per kilowatt hour and PM emissions to 0.02 grams per kilowatt hour.

If used for emergency purposes, however, engines of the same make, model year, and size would not need to satisfy these emissions standards for lawful operation. Those engines are instead supposed to comply with the emissions standards for manufacturers at 40 C.F.R. § 60.4202, *id.* § 60.4205(b), and thus need only be certified at Tier 2 or Tier 3. *Id.* § 60.4202(a)(2). Tier 3 engines of the same size and model-year as the Generators may produce as much as 4.0 grams of NOx per kilowatt hour and 0.2 grams of PM per kilowatt hour, ten times the pollutants permitted for an engine certified under Tier 4. *Id.* § 1039 App. I(c).

Hence the problem here. The Generators were only certified as Tier 3. GEC SUMF Ex. H 4. So unless they legally were used as emergency generators or were subject to a waiver from compliance with the EPA's regulations, their operation would produce up to ten times more emissions of dangerous, unhealthy particles (at Tier 3) than permitted for

non-emergency use (at Tier 4). The Court therefore turns to whether any of those cases excuse the Generators from compliance with the Tier 4 emissions standards.

### 2.    Whether the Generators Are Subject to an Exemption

Despite Alpha's vigorous advocacy to the contrary, the Generators are not excused from Tier 4 compliance.

First, notwithstanding Alpha's argument that the Generators should be subject to more lax standards, these regulations apply here. Alpha submits that the type of generators it procured are used for neither "emergency" nor "prime" purposes, but for some in-between category that should subject them to a different standard due to the "pragmatic challenges" of operating the Microgrid in the Virgin Islands. Alpha MSJ Opp'n Br. 3–4. As GEC correctly points out, however, the EPA's emissions standards do not carve out an exception for the "pragmatic challenges" that Alpha supposedly faced. The EPA recognizes only "emergency" and "non-emergency" categories. GEC MSJ Reply Br. 2 (citing 40 CFR § 60.4219). The Planning Department accordingly instructed that "[JDC] shall limit the use of these generators for emergency use only. The use of the generator for prime power is prohibited." GEC SUMF Ex. L 5.

Second, the Generators do not qualify as emergency generators. To qualify as an "emergency generator," an engine must meet rigorous regulatory requirements. As relevant here, it must be "operated to provide electrical power or mechanical work during an emergency situation," such as "when electric power from the local utility (or the normal power source, if the facility runs on its own power production) is interrupted." *Id.* § 60.4219. An emergency generator can be used for an unlimited amount of time in these

16

emergency situations, but only up to fifty hours per year for non-emergency situations, and those fifty hours "cannot be used for peak shaving or non-emergency demand response." *Id.* § 60.4211(f).

The Microgrid's design, however, called for the Generators to be used to (1) "compensate for uncooperative weather" and (2) provide "peak load supply."  GEC SUMF Ex. G 6.  Even assuming that "uncooperative weather" would "interrupt[]" the Microgrid's "normal power source"—the sun—and therefore plausibly constitutes an emergency, 40 C.F.R. § 60.4219, higher consumer usage clearly would not, *see id.*  As Alpha admitted in its proposal for the Microgrid, servicing peak loads with the Generators was simply "more feasible" because "provid[ing] enough solar and battery standby to meet every conceivable peak in consumption would get very expensive."  GEC SUMF Ex. G 6.  So even though "peak shaving" and "non-emergency demand response" are expressly excluded from the uses permitted for an emergency generator under the Clean Air Act, 40 C.F.R. § 60.4211(f)(3), Alpha's expectation was that the Generators would be used for both purposes.  Indeed, Alpha's proposal explained that the Generators would provide approximately 11% of the development's ongoing power on a regular basis.  GEC SUMF Ex. G 5.

Third, Alpha does not identify any evidence that it obtained a valid waiver of the need to comply with the Act's emissions standards.  *See* 42 U.S.C. § 7411(j)(1)(A).  It contends that the Planning Department's permit operated as such a waiver, and that even if it did not, that Planning Department personnel agreed to grant one.  Alpha MSJ Opp'n Br. 3.  But neither would meet the standard requirements for a waiver.  The Clean Air Act

authorizes the agency to grant a waiver only after notice and opportunity for a hearing to determine, *inter alia*, whether "the owner or operator of the proposed source has demonstrated to the satisfaction of the Administrator that the proposed system will not cause or contribute to an unreasonable risk to public health."  42 U.S.C. § 7411(j)(1)(A).  And such a waiver requires "the consent of the Governor of the [jurisdiction] . . . after notice and an opportunity for public hearing."  *Id.*; *see also* 42 U.S.C. § 7602(d) (defining a "[s]tate" for purposes of the Clean Air Act to include the Virgin Islands).  And with good reason, Alpha does not attempt to explain how the issuance of a permit from the Planning Department or a verbal waiver by Planning Department personnel could meet those requirements.

The permit itself unambiguously disavows any modification of relevant federal regulations: "Permit to Operate this source does not relieve . . . the Permittee[] of the responsibility of compliance with the provisions of any federal or territorial laws, rules, or regulations."  GEC SUMF Ex. L 6.  By the terms of the permit and by operation of federal and territorial law, the Generators had to, and did not, comply with the relevant Clean Air Act emissions standards.  In sum, Alpha and Argonaut do not offer any evidence that creates a genuine dispute over whether the Planning Department granted a waiver from the Clean Air Act's relevant emissions standards.

For these reasons, this Court will GRANT GEC's motion for summary judgment.

### 3.    Consequences for the Dispute Between Alpha and GEC

During the December 12 hearing before this Court, GEC's counsel suggested that granting its motion for summary judgment "would be a ruling that in fact Alpha was in

breach of the contract for failure to provide a lawfully permissible generator for the [M]icrogrid." Oral Arg. Tr. 7:5–7, *Alpha Energy* (D.V.I. Jan. 4, 2024), ECF No. 207. In other words, GEC now asks the Court to enter judgment for GEC on its breach of contract counterclaim, reasoning that Alpha's failure to procure and install generators that complied with the Clean Air Act was a material breach of the Subcontract.

But GEC did not request that relief in its motion for summary judgment. That motion was limited to the "narrow issue" of whether the Generators complied with the Clean Air Act, and only asked the Court to "find as a matter of law that the diesel generator sets procured, supplied and installed by Alpha as part of the Anna's Hope Microgrid are not 'emergency generators,' do not meet the requirements of the Clean Air Act (42 U.S.C. § 4201 et seq.) and EPA regulations adopted thereunder, and cannot be lawfully operated as part of the Microgrid in their intended use." GEC MSJ Br. 1. GEC did not suggest at any point in its motion that it was entitled to summary judgment on its breach of contract counterclaim, and the Court declines to grant GEC relief that it did not seek.

Moreover, though the Court agrees that the Generators did not comply with the Clean Air Act, genuine disputes of material fact remain with respect to GEC's breach-of-contract counterclaim. For example, Alpha argues that GEC knew from its project proposal that the Generators had only been certified as compliant at Tier 3. *See* Alpha Energy Suppl. Br. 2–3, *Alpha Energy* (D.V.I. Jan. 12, 2024), ECF No. 213. GEC also apparently knew from Alpha's project proposal that the Generators would provide approximately 11% of the development's ongoing power and be used to provide peak load supply. *See* GEC

SUMF Ex. G 5.  Thus, according to Alpha, GEC accepted the noncompliant Generators and thereby ratified any breach of contract related to the Generators.  *Id.*

This ratification theory involves a genuine dispute of material fact that must be resolved by a jury.[6]  Accordingly, while the Court GRANTS GEC's motion for summary judgment and holds, as a matter of law, that the Generators did not comply with the Clean Air Act and cannot be lawfully operated, the Court will not enter judgment for GEC on its breach-of-contract counterclaim on this basis.

**B.    Alpha's Motion for Partial Summary Judgment**

We turn next to Alpha's motion for partial summary judgment.  Alpha asks this Court (1) to dismiss GEC's counterclaims, and (2) to order GEC to pay the contract balance for materials and installation, less 10% retainage and plus prejudgment interest.

**1.    GEC's Remaining Counterclaims Mostly Survive**

GEC pleaded counterclaims for breach of contract, unjust enrichment, intentional misrepresentation, and negligent misrepresentation.  GEC First Am. Answer & Countercl. 12.  Alpha and Argonaut launch a bevy of attacks on these counterclaims, both collectively and individually.  Below, I address Alpha's and Argonaut's arguments that go to jurisdiction, construed as a motion to dismiss under Federal Rule of Civil Procedure

---

[6] GEC argues that Alpha forfeited the ratification defense by failing to raise it in its Answer to GEC's First Amended Counterclaim against Alpha.  *See* GEC Suppl. Br. 1, *Alpha Energy* (D.V.I. Jan. 5, 2024), ECF No. 208-1.  But in that Answer, Alpha maintained that "GEC's claims are barred, in whole or in part, by the doctrine of waiver."  Answer to GEC Counterclaims 5, *Alpha Energy* (D.V.I. Oct. 3, 2018), ECF No. 63.  Therefore, it does not appear that GEC's forfeiture argument is supported by the pleadings before the Court.

12(b)(1), and then their arguments that GEC has failed to state a claim, construed as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

i.    *Jurisdiction*

In its motion for summary judgment, Alpha argued that "GEC has no standing to assert claims against Alpha" because "GEC has no liability to JDC."  Alpha Br. in Supp. of Summary Judgment (Alpha MSJ Br.) 4, *Alpha Energy* (D.V.I. Sept. 24, 2020), ECF No. 162.  Specifically, Alpha argued that GEC lacks standing because it "had no pecuniary interest" in the Microgrid after Change Order No. 1 "expressly disclaimed any liability [as to GEC] for anything related to the Microgrid."  *Id.* at 7.  Argonaut, too, argues that GEC "has no standing to assert a claim against [Argonaut]" because "GEC has been paid in full for the work performed by Alpha" and cannot be held liable for any issues with the Microgrid.  Argonaut MSJ Opp'n Br. 7.  During the motion hearing before this Court, however, counsel for Alpha conceded that this argument is better construed as a merits argument about GEC's potential damages, rather than as a jurisdictional argument about GEC's standing to assert its counterclaims.  Oral Arg. Tr. 56:11–12.

To the extent that either of these parties are still arguing that GEC lacks standing to assert its claims, that argument fails.  As an initial matter, Change Order No. 1 appears to constrain only JDC, not GEC.  It purports to limit JDC's ability to sue GEC in connection with the Microgrid, requiring JDC to "look solely to Alpha" for liability under the Subcontract.  Alpha SUMF Ex. A 7 ¶ 2(b).  But on its face, it places no constraints on

*GEC's* ability to look to Alpha for breach of contract or other claims.[7]

GEC's allegations are clearly sufficient to establish that it suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see* Alpha MSJ Br. 5. Each of GEC's counterclaims is based in a concrete injury. First, GEC has standing to assert its breach of contract counterclaim based on its allegation that it has repaired Alpha's shoddy handiwork "at substantial expense" and had to complete much of the Microgrid itself. GEC First Am. Answer & Countercl. ¶¶ 26, 29. Second, GEC pleaded a similar injury to sustain its unjust enrichment counterclaim, alleging that Alpha "induced GEC into paying it the sum of $327,096.00 without delivering any valuable consideration in return." *Id.* ¶ 35. That allegation plainly satisfies *Lujan*.[8] Finally, GEC alleges multiple injuries flowing from Alpha's alleged misrepresentations, including "expenses incurred and work

---

[7] Even if this Court were to credit Alpha's interpretation of this provision in Change Order No. 1, dismissal would still be inappropriate. GEC identifies multiple clauses in the General Contract that it contends obligated it to deliver a functioning Microgrid or face a claim for liquidated damages from JDC. GEC Br. in Opp'n to Alpha Energy Mot. for Summary Judgment (GEC MSJ Opp'n Br. (*Alpha Energy*)) 3–4, *Alpha Energy* (D.V.I. Oct. 15, 2020), ECF No. 172. Thus, even if Change Order No. 1 were read to disclaim GEC's liability, these dueling contractual provisions would create ambiguity on the issue of GEC's liability for liquidated damages and thus give rise to a jury question. *See Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 362 (3d Cir. 1987); *Joseph v. Church of God (Holiness)*, 47 V.I. 419, 427–28 (2006); *see also* 75A Am. Jur. 2d Trial § 665 ("Where the evidence is conflicting, or the terms are ambiguous or doubtful, as where terms of art are used, and resort to extrinsic evidence is necessary, it must be left to the jury to say what the contract means."); 11 Williston on Contracts § 30:7 (4th ed.) ("When a written contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of parties in entering the contract.").

[8] The liability clause in the General Contract is irrelevant to this claim because "in an action for unjust enrichment, a plaintiff need only establish that the defendant's gain was 'without adequate legal basis.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 257 (4th Cir. 2020).

performed by GEC that were within Alpha's responsibility" and "damage to GEC roof membranes caused by Alpha."  GEC MSJ Opp'n Br. (*Alpha Energy*) 4–5.  *See also* GEC First Am. Answer & Countercl.  ¶¶ 26–29.  GEC therefore has standing to plead each of its counterclaims.

### ii.    Failure to State a Cause of Action

Alpha next raises a series of arguments that GEC has failed to state a claim.

First, it suggests that a longstanding doctrine in construction law bars "pass-through claims in construction disputes" like GEC's where, as here, the general contractor has been paid in full.  Alpha MSJ Br. 4.  But the case on which Alpha predicates this argument, *Severin v. United States*, 99 Ct. Cl. 435 (1943), is inapposite.  For one thing, "the *Severin* doctrine is based on concepts of sovereign immunity and privity and concerns only standing to raise contractual claims against governmental entities."  *Umpqua River Navigation Co. v. Crescent City Harbor Dist.*, 618 F.2d 588, 593 (9th Cir. 1980).  Thus, it has no bearing on the resolution of a purely private dispute like this one.  Furthermore, GEC does not seek to assert a "pass-through" claim for damages incurred by JDC.  Rather, it seeks damages based on its own alleged injuries due to Alpha's failure to perform under the Subcontract.  GEC First Am. Answer & Countercl. ¶¶ 26–37.

Alpha next contends that, even if GEC has standing, its misrepresentation claims must be dismissed because Alpha never furnished any information to GEC on which it could have relied.  But that contention is contradicted by the record developed to date, which reflects that Alpha did provide such information.  As discussed above, the Subcontract contained express representations about Alpha's ability to build the Microgrid

and comply with relevant laws.  Alpha SUMF Ex. A 2.  Change Order No. 1 also incorporated Alpha's proposal by reference, Alpha SUMF Ex. A 7 ¶ 2, and GEC was entitled to rely on these representations when it entered into the Subcontract.[9]

Ultimately, however, Alpha is correct that GEC has not stated a separate negligent misrepresentation claim because GEC has not suffered any damages on the Microgrid independent of Alpha's breach of contract.  Alpha MSJ Br. 8.  Under the economic loss doctrine, "where there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 620 (3d Cir. 1995); *see also Turnbull v. Univ. of the V.I.*, No. ST-07-CV-239, 2016 WL 1047893, at *5 (V.I. Super. Ct. Mar. 2, 2016).  While the doctrine does not apply where "there is no evidence that the parties have allocated the risks of their bargain contractually, nor reason to think that they should have," *Turnbull*, 2016 WL 1047893 at *6, it clearly bars GEC's negligent misrepresentation claim here.  Unlike *Turnbull*, this case presents a distinctly commercial dispute between two sophisticated parties who "have allocated the risks of their bargain contractually," *id.*, so GEC does not need a separate tort to be made whole.

---

[9] Even if Alpha had made no direct representations to GEC, GEC still could press a negligent misrepresentation claim because the elements of a negligent misrepresentation claim do not require any direct communication from the defendant to the plaintiff.  Instead, the Virgin Islands Supreme Court has said that a negligent misrepresentation claim requires a plaintiff to show only, *inter alia*, "that [the defendant] supplied false information . . . in the course of [the defendant's] business." *Chestnut v. Goodman*, 59 V.I. 467, 475 (2013) (citations omitted).  Direct communication is not an element of this claim.

GEC's counsel agreed to withdraw its negligent misrepresentation claim during the hearing before this Court, Oral Arg. Tr. 5:21–24, "for prudential reasons," GEC Suppl. Br. 4 n.7, *Alpha Energy* (D.V.I. Jan. 5, 2024), ECF No. 208-1.  I therefore will dismiss GEC's negligent misrepresentation counterclaim.[10]

In sum, the Court declines to dismiss GEC's counterclaims for breach of contract, unjust enrichment, and intentional misrepresentation, but will dismiss its counterclaim for negligent misrepresentation.

---

[10] Alpha only moved for summary judgment on "GEC's claim for negligent misrepresentation," Alpha MSJ Br. 6, but GEC pleaded two separate misrepresentation causes of action in its First Amended Answer and Counterclaim by asserting that Alpha's representations were "knowingly and/or negligently false when made."  GEC First Am. Answer & Countercl. ¶ 8; *see Mendez v. Coastal Sys. Dev., Inc.*, Civ. No. 2005-0165, 2008 WL 2149373, at *10 (D.V.I. May 20, 2008) ("To successfully allege an act of fraud or misrepresentation, a complainant must demonstrate [among other elements] a knowing misrepresentation of a material fact.").  Indeed, Alpha's counsel agreed during the hearing before this Court that it did not move for summary judgment on GEC's claim for intentional misrepresentation and acknowledged that the intentional misrepresentation claim raises genuine disputes of material fact.  Oral Arg. Tr. 61:19–24, *Alpha Energy* (D.V.I. Jan. 4, 2024), ECF No. 207.  Alpha did not argue in its motion for summary judgment that the economic loss doctrine bars GEC from asserting its intentional misrepresentation claim, and Alpha's counsel could not offer any reason why it failed to do so during the motion hearing. Oral Arg. Tr. 63:3–4.  Thus, this Court will not dismiss GEC's separate intentional misrepresentation claim.  *See, e.g.*, *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 83 n. 12 (3d Cir. 2017) (explaining that a party's failure to raise an argument until oral argument before the district court "waives the argument"); *United States v. Dowdell*, 70 F.4th 134, 143 (3d Cir. 2023) (explaining that "parties cannot get a second bite at the apple at oral rulings").

GEC also argued in its post-hearing supplemental brief that its intentional misrepresentation claim is not precluded by the economic loss doctrine because that claim is really "a claim for punitive damages for fraud in the inducement, a remedy not provided under contract and not duplicative of contract damages."  GEC Suppl. Br. 4.  The Court need not resolve that contention, however, as Alpha did not argue that the intentional misrepresentation claim should be dismissed under the economic loss doctrine until the motion hearing on December 12.

## 2.    Alpha Is Not Entitled to Additional Payment Under the Subcontract.

In addition to its attempts to dismiss GEC's counterclaims, Alpha moves for partial summary judgment on its own breach of contract claim as it relates to the payment milestones for "materials and installation, less the 10% retainage under the [Subcontract], together with statutory interest at the rate of 9% per annum."  Alpha MSJ 1.  Specifically, Alpha contends that it is entitled to payment for completing two of the milestones under the Subcontract and that GEC has breached by failing to make that payment when GEC itself was paid in full.

Alpha is mistaken, at least at the summary judgment phase.  No doubt, "[i]t is a material breach of a contract [for an obligor] to fail to pay any substantial amount of the consideration owing under the contract."  23 Williston on Contracts § 63:16 (4th ed.).  But if the obligee has already breached, its right to payment is extinguished.  Restatement (Second) of Contracts § 237 (Am. L. Inst. 1981) ("[W]here performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance . . . if there has already been an uncured material failure of performance by the other party."); *see also V.I. Taxi Ass'n v. V.I. Port Auth.*, No. ST-97-CV-117, 2014 WL 12949501, at *8 n.65 (V.I. Super. Ct. Aug. 7, 2014) (adopting § 237 of the Restatement as the appropriate rule for Virgin Islands law).

Here, a reasonable jury could conclude that Alpha's procurement and installation of the non-compliant Generators was a material breach of the Subcontract that occurred as early as February 2016, GEC SUMF Ex. I 3, which extinguished GEC's obligations to pay

going forward.  And with GEC having formally terminated the Subcontract in July 2018, GEC CSUMF (*Alpha Energy*) ¶ 45, Alpha was no longer "entitled to receive any further payment" until the Microgrid was complete, Alpha Ex. A 3 ¶ 23; *see also* GEC MSJ Opp'n Br. (*Alpha Energy*) 10.  While Alpha will be entitled to partial payment for its contributions to the construction of the Microgrid (less damages that GEC can prove), the measure of those damages is a question for a jury.[11]  *See* 24 Williston on Contracts § 64:7 (4th ed.) ("[T]he amount of damages suffered is ordinarily for the jury . . . .").

For the foregoing reasons, Alpha's motion for partial summary judgment is DENIED IN PART and GRANTED IN PART with respect to GEC's counterclaims, and GEC's counterclaim for negligent misrepresentation is DISMISSED.

## C.    Argonaut's Motion for Summary Judgment

Also pending before this Court is Argonaut's motion for summary judgment, which raises four arguments: (1) that it had no obligation to pay GEC under the performance bond due to GEC's Owner Default, Argonaut MSJ Br. 11; (2) that GEC materially altered Argonaut's risk "when it agreed to assume liability for the electric costs" for the Microgrid, extinguishing any right to payment under the performance bond, *id.*; (3) that the costs GEC

---

[11] Alpha points us to emails that it says show that GEC either conceded that it was entitled to payment or that GEC and JDC have colluded to avoid paying it and thus summary judgment in its favor is proper.  But the precise meaning of the emails that Alpha cites, *see* Alpha SUMF Ex. C 1, is unclear, and GEC has identified another email from just a month later in which it emphasized "that Alpha needs to perform in order to get paid" and identified several action items on which Alpha was behind schedule.  GEC CSUMF (*Alpha Energy*) Ex. K 2.  Reconciling these conflicting messages falls squarely within the province of the jury.  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (citation omitted); *see also* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725.2 (4th ed.).

incurred in connecting Anna's Hope to the Power Authority's grid are not recoverable under the performance bond, *id.* at 15; and (4) that there is no cognizable "cause of action for 'bad faith' against a surety," *id.* at 17, and even if there were, Argonaut did not act in bad faith, *id.* at 19–20.   For the reasons explained below, each of these arguments is inconsistent with the record developed to date, raises a genuine dispute of material fact, or reprises positions that this Court already rejected when it denied Argonaut's motion to dismiss. *See generally* Am. Op. Denying Argonaut's Mot. to Dismiss (Op. Denying Argonaut's MTD), *Argonaut* (D.V.I. Aug. 28, 2023), ECF No. 131.

As an initial matter, although the performance bond was executed between Argonaut and Alpha, Argonaut MSJ Ex. I 1, GEC may recover under the bond because it was an intended third-party beneficiary.   A third party is an intended beneficiary of a contract when "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."   Restatement (Second) of Contracts § 302(1).   And in the Virgin Islands, intended third-party beneficiaries can sue to enforce the terms of a contract. *See Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 555 (2012), *overruled on other grounds by Yusuf v. Hamed*, 59 V.I. 841 (2013); *Lopez v. Renaissance St. Croix Carambola Beach Resort & Spa*, 70 V.I. 27, 35–36 (2019) (adopting Restatement (Second) of Contracts § 304).

Here, GEC is clearly an intended third-party beneficiary of the performance bond. In the event of Alpha's non-performance, the bond requires Argonaut to either complete construction of the Microgrid, arrange for another subcontractor to complete construction

of the Microgrid, or pay GEC damages for Alpha's non-performance.  Argonaut MSJ Ex. I 3.  If Argonaut fails to perform under these terms, the bond also provides that "[GEC] shall be entitled to enforce any remedy available." *Id.*  These terms evince an intention to create an obligation running from Argonaut to GEC, so GEC may enforce the terms of the performance bond as a third-party beneficiary.[12]

The Court now turns to each of Argonaut's contentions in support of summary judgment.

### 1.    GEC Was Not in Owner Default

Under the performance bond, an Owner Default would have occurred if GEC had failed to pay Alpha "as required under the [Subcontract]."  Argonaut MSJ Ex. I 4.  Argonaut reads the performance bond as creating an unconditional obligation for GEC— that "*any* failure by GEC LLC to pay Alpha mean[t] that [Argonaut's] obligations never arose."  Argonaut MSJ Br. 13 (emphasis added).  But as GEC points out, this would only be true if Alpha had not already breached, *i.e.*, if there had not already been a Contractor Default.  GEC Br. in Opp'n to Argonaut Insurance Mot. for Summary Judgment (GEC MSJ Opp'n Br. (*Argonaut*)) 5, *Argonaut Insurance* (D.V.I. Oct. 15, 2020), ECF No. 110;

---

[12] Courts in other jurisdictions have also recognized that an obligee in a performance bond is an intended third-party beneficiary that may sue the surety to enforce the bond. *See, e.g.*, *Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27 J*, 940 P.2d 348, 354 n.6 (Colo. 1997) ("Similarly, the obligee in a suretyship agreement is analogous to a third-party beneficiary because the suretyship agreement, in this case a performance bond, is designed solely for the obligee's benefit."); *Loyal Ord. of Moose, Lodge 1392 v. Int'l Fidelity Ins. Co.*, 797 P.2d 622, 628 (Alaska 1990) (explaining that an obligee in a suretyship agreement was an intended third-party beneficiary of the agreement); *Carulli v. North Versailles Twp. Sanitary Auth.*, 216 A.3d 564, 579 n.11 (Pa. Commw. Ct. 2019) (same).

Argonaut MSJ Ex. I 4.  A reasonable jury could conclude that Alpha was in breach as early as February 2016, GEC SUMF Ex. I 3, which would mean that it had no right to payment under the Subcontract after that date and that GEC could not have been in Owner Default when it declared a Contractor Default on January 27, 2017.  Argonaut SUMF ¶ 27.

Relatedly, Argonaut argues that its obligation to pay GEC never arose because GEC failed to satisfy the conditions precedent to payment that were enumerated in the bond. Argonaut MSJ Br. 11.  Specifically, Argonaut points to Paragraph 3 of the Performance Bond, which provided that "the Surety's obligation under this Bond shall arise after . . . the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract."  Argonaut MSJ Ex. I 3.  Because GEC failed to pay Alpha "the Balance of the Contract Price in accordance with the terms of the Construction Contract," Argonaut insists that its obligation to pay GEC never arose.  Argonaut MSJ Br. 11.

Under the terms of the Subcontract, however, GEC was only obligated to pay Alpha if the unpaid balance of the Subcontract exceeded the costs and expenses that GEC incurred to remedy Alpha's defective performance.  Alpha SUMF Ex. A 3.  And here, there is a genuine dispute of material fact concerning whether the unpaid balance of the Subcontract exceeded the costs and expenses that GEC incurred as a result of Alpha's breach. According to GEC's damages expert, GEC's "anticipated total cost of damages" as a result of Alpha's breach is $3,976,214, which far exceeds the balance owed to Alpha under the

Subcontract.[13]  Argonaut MSJ Ex. G 21.  Taking the facts in the light most favorable to

GEC, it had no obligation under the Subcontract to pay Alpha.  Accordingly, the Court

must assume, for summary judgment purposes, that GEC met the conditions precedent

enumerated in the Performance Bond because it did not miss a payment under "the terms

of the Construction Contract."  Argonaut MSJ Ex. I 3.

## 2.    GEC Did Not Materially Alter Argonaut's Risk

Argonaut next posits that, by covering the cost of connecting Anna's Hope to the

Power Authority's grid, GEC "made a material alteration to [its] risk without [its] consent"

and thus voided the performance bond.  Argonaut MSJ Br. 13–14; *see also* Restatement

(Third) of Suretyship & Guaranty § 41(b)(i) (Am. L. Inst. 1996).  But it is difficult to

characterize this as an alteration of Argonaut's risk as a matter of law.  To the extent that

GEC is seeking to recover its payments to the Power Authority, it is merely seeking

---

[13] At the motion hearing before this Court, Argonaut's counsel insisted that the cost of connecting Anna's Hope to the Virgin Islands Water and Power Authority should be excluded from the calculation of damages. *See, e.g.*, Oral Arg. Tr. 76:2–6; 81:11–16.  But under the terms of the Subcontract, Alpha is on the hook for "all costs of completing the Work, all payments for labor, materials equipment, machinery, tools, plant facilities, services, all other obligations of the Subcontractor and/or Supplier incurred by the Subcontractor and/or Supplier and paid directly by the Contractor [for] any damages incurred through the default of the Subcontractor and/or Supplier, and also any other costs or expenses incurred by the Contractor[.]"  Alpha SUMF Ex. A 3.  The precise measure of these damages is a question for the jury. *See* 24 Williston on Contracts § 64:7 (4th ed.) ("[T]he amount of damages suffered is ordinarily for the jury . . . .").  And here, a reasonable jury could conclude that, because GEC would not have had to connect Anna's Hope to the Water and Power Authority if Alpha had delivered a functioning Microgrid, the damages GEC suffered as a result of Alpha's breach exceeded the unpaid balance of the Subcontract.  The Court will not conclude as a matter of law that the cost of connecting Anna's Hope to the Power Authority should be excluded from the calculation of damages.

consequential damages as against Alpha for Alpha's breach.[14]  *See* GEC MSJ Opp'n Br. (*Argonaut*) 7.  ("GEC's agreement to pay utility costs pending Microgrid completion was made in mitigation of any claim by JDC for Liquidated Damages for failure to deliver the Anna's Hope Project with electrical utility service provided by the Microgrid.").  That would not alter Argonaut's risk, which was and remained the risk of that breach occurring.

In its Reply Brief, Argonaut contends that any risk of liquidated damages was illusory because JDC paid GEC in full, Argonaut Reply Br. in Supp. of Mot. for Summary Judgment 10, *Argonaut Insurance* (D.V.I. Nov. 9, 2020), ECF No. 117, but that cannot be

---

[14] During the motion hearing before this Court, Argonaut asserted that consequential damages cannot be recovered under performance bonds.  *See, e.g.*, Oral Arg. Tr. 82:2–7.  But the very treatise that Argonaut cites as "the leading treatise . . . on construction law," *Id.* at 76:12–14, explains that  recovery of damages ultimately depends on "the terms of the bond and the bonded contract" and acknowledges that consequential damages may be recovered "when reasonably foreseeable at the time of contracting as directly flowing from the breach of the bonded contract," 4A Bruner & O'Connor on Construction Law § 12:35 (West 2023).  And while no court in the Virgin Islands has considered the question, other federal courts have recognized that consequential damages may be recovered under performance bonds.  *See, e.g.*, *Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*, 559 F.Supp.3d 368, 372 (D. Del. 2021) ("We interpret the performance bond to impose liability upon the insurer consistent with what the owner and builder agreed as to consequential damages."); *Lehndorff U.S. Equities, Inc. v. George Hyman Const. Co.*, No. 90-cv-02572, 1992 WL 135907, at *10 (D.D.C. May 27, 1992) ("Moreover, sureties issuing performance bonds have been held liable for a variety of consequential damages beyond mere completion costs, and limited only by the penal amount of the bond."); *U.S. Sur. Co. v. United States*, 83 Fed. Cl. 306, 311 (2008) (determining that the government was entitled to withhold liquidated damages arising out of a performance bond as "a substitute for the consequential damages incurred as a result of a contractor's breach").  Here, the performance bond expressly provides that Argonaut may be liable for "the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract," "additional legal, design professional and delay costs resulting from the Contractor's Default," and "actual damages caused by delayed performance or non-performance of the Contractor."  Argonaut MSJ Ex. I 4.  This broad language suggests that Argonaut is responsible for the consequential damages that GEC incurred as a result of Alpha's breach.

a basis for granting it summary judgment either. GEC vigorously disputes that assertion, GEC MSJ Opp'n Br. (*Argonaut*) 8 & n.22, and Argonaut does not meaningfully explain how GEC has altered its risk when GEC has disclaimed any right to payment "exceed[ing] the penal sum" of the performance bond, GEC MSJ Opp'n Br. (*Argonaut*) 9. *Accord Mount Vernon Cnty. Sch. Dist. v. Nova Cas. Co.*, 968 N.E.2d 439, 446 (N.Y. 2012) (rejecting as conclusory a surety's allegation that its risk was materially altered where it "does not illustrate how or to what extent").

### 3. A Jury Must Decide if Argonaut Conducted its Inspection in Bad Faith

Finally, whether Argonaut's inspection was conducted in bad faith is in dispute, so Argonaut's attacks on GEC's implied covenant claim are unavailing.

Under Virgin Islands law, a party to a contract breaches the implied covenant of good faith and fair dealing when "'(1) a valid contract exists between the parties, and (2) acts committed by the [defendant] amount to fraud or deceit or an unreasonable contravention of the parties' reasonable expectations under the contract;' and (3) . . . 'damages [are] suffered as a result.'" *Dukes v. Fay Servicing, LLC*, No. 3:18-cv-0064, 2022 WL 16855409, at *4 (D.V.I. Nov. 10, 2022) (quoting *Arvidson v. Buchar*, 71 V.I. 277, 336 (V.I. Super. Ct. 2019)). This duty "arises by implication through the existence of a contract itself." *Chapman v. Cornwall*, 58 V.I. 431, 441 (2013) (citation omitted).

Argonaut first reprises many of its contentions from its failed attempt to dismiss GEC's implied covenant claim in a Rule 12(b)(6) motion, arguing that such a claim cannot be brought against sureties. Argonaut MSJ Br. 17–18. But for the reasons stated in this Court's Amended Opinion Denying Argonaut's Motion to Dismiss, *see generally* Op.

Denying Argonaut's MTD, and this Court's Memorandum Opinion and Order on Argonaut's Motion for Reconsideration, *Argonaut Insurance* (D.V.I. Aug. 28, 2023), ECF No. 130, Virgin Islands law permits obligees to pursue claims for breach of the implied covenant of good faith and fair dealing against issuers of a performance bond.[15]

Nor does GEC's status as a third-party beneficiary change this conclusion. Neither party has identified any statutory authority or any case from the Virgin Islands Supreme Court regarding whether a third-party beneficiary can bring a contract claim for breach of the implied covenant of good faith and fair dealing. In the absence of such authority, this Court must (1) research whether Virgin Islands courts have articulated an on-point rule, (2) analyze what the majority of other courts do, and then (3) determine "most importantly, which approach represents the soundest rule for the Virgin Islands." *Simon v. Joseph*, 59

---

[15] During the motion hearing before this Court, Argonaut again pressed this Court to reconsider its conclusion that Virgin Islands law permits obligees to pursue claims for breach of the implied covenant of good faith and fair dealing against issuers of a performance bond. *See* Oral Arg. Tr. 878:16–22. This Court originally rejected Argonaut's argument because it fundamentally misconstrued GEC's claim against Argonaut as a tort claim of bad faith, when it is in fact a contractual claim that Argonaut breached the implied covenant of good faith and fair dealing. *See* First Am. Compl. ¶ 36, *Argonaut* (Feb. 8, 2019), ECF No. 18. Recognizing this distinction, Argonaut insisted during argument that one of the cases it cited in its motion, *U.S. Sewer & Drain, Inc. v. Earle Asphalt Co.*, No. 15-1461, 2015 WL 3461087, at *2 (D.N.J. June 1, 2015), held that a contract claim for breach of the implied covenant of good faith and fair dealing does not exist against a surety. Oral Arg. Tr. 86:11–22. But it is at best ambiguous whether the *Earle Asphalt* court was considering a contract claim based on the implied covenant of good faith and fair dealing, rather than a tort claim. Indeed, the court's analysis of the "bad faith" claim in that case exclusively cited cases discussing tort claims for bad faith, rather than contract claims for breach of the implied covenant of good faith and fair dealing. *Earle Asphalt*, 2015 WL 3461087, at *2–3.

V.I. 611, 622–23 (2013) (citing *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 974–80 (2011)).

The parties have not identified any Virgin Islands authority discussing whether a third-party beneficiary can assert a claim for breach of the implied covenant, and this Court has not located any such authority.  But a survey of case law from other jurisdictions confirms that the majority approach is to allow third-party beneficiaries like GEC to assert claims for such a breach.  As a general matter, third-party beneficiaries can typically assert any claim that would be available to a contracting party.  *See, e.g.*, *Bituminous Coal Operators' Ass'n v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989) ("In the usual case, a third party beneficiary that brings a contract claim steps into the shoes of the promisee . . .").  And in most states, courts have allowed third-party beneficiaries to state claims for breach of the implied covenant of good faith and fair dealing.[16]  Based on this persuasive authority, this Court concludes that the "soundest rule for the Virgin Islands," *Simon*, 59

---

[16] *See, e.g.*, *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F.Supp.2d 563, 570 (D.N.J. 2010) ("The implied covenant of good faith and fair dealing exists in every contract under New Jersey Law . . . As a third party beneficiary, Cargill is entitled to enforce the terms of the contract, including the implied covenant."); *Jones Lang LaSalle New Eng., LLC v. 350 Waltham Assocs., LLC*, No. 17-cv-11784, 2020 WL 419516, at *7 (D. Mass. Jan 27, 2020) (explaining that third-party beneficiaries "may assert that [d]efendants breached the implied covenant of good faith and fair dealing" under Massachusetts law); *Baker v. Goldman Sachs & Co.*, 656 F.Supp.2d 226, 236 (D. Mass. 2009) (applying New York law and explaining that third-party beneficiaries may state claims for breach of the implied covenant of good faith and fair dealing); *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 26 Cal. Rptr. 2d 762, 770 (Ct. App. 1994) ("Certainly a non-contracting party is entitled to sue an  insurer for breach of the implied covenant *if* that non-contracting party is a third party beneficiary of the insurance contract."); *Casey Elec., LLC v. Constr. Mgmt. Servs., Inc.*, No. 09-cv-00469, 2009 WL 3853819, at *2 (D. Conn. Nov. 17, 2009) ("Connecticut courts have held that third party beneficiaries can sue a contracting party for breach of the covenant of good faith and fair dealing.").

V.I. at 623, is that third-party beneficiaries may assert claims under the implied covenant of good faith and fair dealing. As a third-party beneficiary to the performance bond, GEC can therefore assert a claim for breach of the implied covenant against Argonaut.

Argonaut also contends that it could not have acted in bad faith in any event because Section 5.4 of the performance bond provided it with an "express right . . . to deny liability," Argonaut MSJ Br. 19–20, and "where the terms of the parties' contract are clear, the implied covenant of good faith and fair dealing will not override the contract's express language," *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 272 (3d Cir. 2004).[17] Here, however, we lack such clarity.

Section 5.4 of the performance bond says:

§ 5: When [GEC] has satisfied the conditions of Section 3, [Argonaut] shall promptly and at [its] expense take one of the following actions:

. . .

§ 5.4: Waive its right to perform . . . and with reasonable promptness under the circumstances:
.1: After investigation, determine the amount for which it may be liable . . . or
.2: Deny liability in whole or in part and notify [GEC], citing the reasons for denial.

Argonaut MSJ Ex. I 3. This Court does not read § 5.4.2 as expressly committing to Argonaut's sole, unbridled discretion whether to decline to pay under the performance

---

[17] By way of example, Argonaut points to *Future Sanitation, Inc. v. Evergreen National Indemnity Company*, where the district court held, as a matter of law, that there could be no breach of the implied covenant where the surety agreement "expressly" committed to the surety's "sole discretion" whether to renew certain bonds. No. 17-3471 (MAS) (TJB), 2019 WL 6456474, at *10 (D.N.J. Nov. 30, 2019).

bond.  Instead, it imposes two important limitations on Argonaut's right to refuse to pay. Argonaut must (1) notify GEC of its decision and (2) explain why it chose not to.  *Id.*  Even accepting that Argonaut must exercise some discretion in determining if the conditions for payment are satisfied, it could not exercise that discretion "in bad faith or in a commercially unreasonable manner."  *In re Kaplan*, 143 F.3d 807, 818 (3d Cir. 1998).  This is a classic case "where the terms of a contract are not specific, [so] the implied covenant of good faith and fair dealing may fill in the gaps where necessary to give efficacy to the contract as written."  *Fields*, 363 F.3d at 271–72.

Moreover, the material facts relating to Argonaut's inspection are in heated dispute. GEC's opposition to Argonaut's motion includes a comprehensive catalog of contested issues, including Young's conclusions about the state of the Microgrid and the factual premises underlying Argonaut's denial letter.  GEC MSJ Opp'n Br. (*Argonaut*) 10–12.  For example, GEC disputes whether the Generators were "empty" and contends that Argonaut never told GEC that connecting Anna's Hope to the Microgrid would be necessary for Young's inspection.  *Id.* at 11–12; GEC Response to Argonaut MSJ 8–9.  In light of these genuine disputes, a jury should determine what happened at Anna's Hope that day.

For the foregoing reasons, Argonaut's motion for summary judgment is DENIED.

## CONCLUSION

For the reasons discussed above, the Court GRANTS GEC's Motion for Summary Judgment, but DENIES Argonaut's Motion for Summary Judgment.  In addition, the Court

DENIES IN PART and GRANTS IN PART Alpha Energy's Motion for Partial Summary

Judgment, and GEC's counterclaim for negligent misrepresentation shall be DISMISSED.

SO ORDERED.

Dated:   March 15, 2024

_____
s/Cheryl Ann Krause
CHERYL ANN KRAUSE
United States Circuit Judge